1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF ARKANSAS
2
                       Case No. 4:17-CR-00137-JM-1
3
UNITED STATES OF AMERICA,        )
4                                )
        GOVERNMENT,              )
5                                )
        -v-                      )
6                                )
DANNY RAY WILLIAMS, JR.,         )
7                                )
        DEFENDANT.               )    Little Rock, Arkansas
8                                )    January 4, 2021
_____)
9


10            TRANSCRIPT OF SENTENCING PROCEEDINGS

11          BEFORE THE HONORABLE JAMES M. MOODY, JR.

12                 UNITED STATES DISTRICT JUDGE

13


14  Appearances:

15  FOR THE GOVERNMENT          Michael S. Gordon, ESQ., AUSA
                                U.S. Attorney's Office
16                              Eastern District of Arkansas
                                Post Office Box 1229
17                              Little Rock, AR 72203

18  FOR THE DEFENDANT           Arkie Byrd, ESQ.
                                Mays, Byrd & Associates, P.A.
19                              212 Center Street, Suite 700
                                Little Rock, AR 72201
20
    Reporter                    Stephen W. Franklin, RMR, CRR, CPE
21  (561)313-8439               Official Court Reporter
                                500 West Capitol Avenue
22                              Little Rock, AR 72201
                                E-mail:  SFranklinUSDC@aol.com
23

        Proceedings reported by machine stenography, and
24  transcript prepared utilizing computer-aided transcription.

25

1           (Call to the order of the Court at 1:16 p.m.)

2           THE COURT:  We're on the record in United States

3    versus Danny Ray Williams, Jr., case number 4:17CR137.

4    Mr. Williams is present in the courtroom with his lawyer,

5    Arkie Byrd, and the government's represented by Mike Gordon.

6           We are here perhaps on a lot of business.  The first

7    order of business will be Mr. Williams' motion to withdraw his

8    guilty plea, which is document number 135.  I have that

9    document before me, as well as the government's response to

10   the motion to withdraw the plea, which is 149.

11          Ms. Byrd, I'll hear from you on anything you have to

12   add to your motion at this time.

13          MS. BYRD:  Well, as per what my client advised me of

14   on his basis for seeking that motion, I think I have, to the

15   best of my knowledge, I have included it all in that motion.

16          THE COURT:  Okay.

17          MS. BYRD:  That I'm aware of.

18          THE COURT:  All right.  Mr. Gordon, do you want to

19   respond to anything in addition to what you put in your

20   response document 149?

21          MR. GORDON:  Your Honor, I have nothing further to

22   add unless the Court has questions for me.

23          THE COURT:  I don't have any questions.

24          I guess the only thing that seems to go against each

25   other on the law is Ms. Byrd's assertion that unless the

1  government can prove prejudice, that I shouldn't make it to

2  the other factors to determine whether or not the guilty plea

3  requires me to set it aside, where you indicate pretty much

4  the opposite, that unless good cause can be shown, I don't get

5  to the other factors.

6          Do you want to speak -- do you understand the

7  question I'm asking?

8          MR. GORDON:  I do.  On that fourth element?

9          THE COURT:  Well, there's four elements, and I guess

10 you and Ms. Byrd differ on where I start my analysis.  Her --

11 on her legal argument portion on page 4 it says the standard

12 for permitting the withdrawal of the guilty plea as fair and

13 just deals with those four elements, and I was trying to read

14 back and find out her indication of that application of that

15 law was that unless -- Ms. Byrd, help me -- where it says that

16 unless they can prove prejudice I don't get to the other

17 factors.  Am I remembering your --

18         MS. BYRD:  Yes, I think you are correct.

19         THE COURT:  Well, I'm trying to find the spot in

20 your brief, and as short as it is I should be able to find it

21 pretty quickly.

22         MS. BYRD:  Page 5.

23         THE COURT:  Pardon me?

24         MS. BYRD:  Page 5.

25         THE COURT:  Okay.

1          MS. BYRD:  "As regards to whether the government

2   will be prejudiced, it is counsel's understanding," that's

3   where I address that issue at least, well, the issue of

4   prejudice.

5          THE COURT:  Okay.  I see it.

6          Mr. Gordon, do you see where we're talking about

7   under Savage?

8          MR. GORDON:  I do, Your Honor.

9          THE COURT:  And then in your pleading it seems to

10  indicate that until I get to good cause I don't address

11  prejudice to the government.  Let's see.  Yours would be on

12  page 6 under the line that begins with "Alvarado.

13  Furthermore, if the defendant fails to establish a fair and

14  just reason, the Court need not address the remaining

15  considerations."

16         MR. GORDON:  Correct.

17         THE COURT:  And so I'm -- I guess one is cited in

18  '77, and yours is in '93.

19         MR. GORDON:  And I would also point out that the

20  defendant's citation is to the Fourth Circuit, not the Eighth

21  Circuit.

22         THE COURT:  Okay.

23         MR. GORDON:  All of that law cited to in my brief

24  comes from the Eighth Circuit.

25         THE COURT:  I see.  I didn't pick up that

1    distinction before.

2            Okay.  Well, then under that particular issue before

3    me, I'm going to resolve that and use the Eighth Circuit case

4    that was cited to me, which appears to be Wicker, which is 80

5    F.3d at 266, quoting United States versus Nichols, which is

6    986 F.2d 1199.  And that's the Eighth Circuit of 1993, as

7    opposed to the Fourth Circuit case of Savage, and I'm going to

8    apply that law.

9            That having been established, Ms. Byrd, do you have

10   anything you want to -- more you want to offer, or Mr. Gordon?

11           MS. BYRD:  No, Your Honor.

12           THE COURT:  Mr. Gordon?

13           MR. GORDON:  No.  But to that point, Your Honor, I

14   would just point out, to cover prejudice to the United States,

15   this investigation was almost four years ago at this point,

16   and the defendant pled guilty over two years ago.  And so --

17   and I can just tell you in preparing for the issues in this

18   hearing, because this case is so old, because the defendant

19   pled guilty so long ago, even getting ready for this hearing

20   was difficult, because the evidence is so old and the case has

21   essentially been resolved for almost two and a half years.

22   And going back and finding witnesses, at this point we're not

23   sure that that would be possible.

24           So I think that those facts alone establish

25   prejudice to the government, although I do not believe the

1    Court ever needs to get there.

2              THE COURT:  Okay.  I have reviewed the transcript of

3    the guilty plea hearing which was dated September the 6th of

4    2018, where Mr. Williams was represented by Mr. Cannon.  I

5    went over almost every issue that Mr. Williams has brought up

6    in his motion to withdraw his guilty plea with him at that

7    hearing, and I'm convinced that he was aware of what his

8    statutory penalty was, what he was pleading to and the

9    benefits that were given to him from his plea agreement.

10             He was advised at the beginning of the hearing that

11   he needed to be truthful with me and that what the

12   consequences were if he were not.  His statements lead me to

13   believe that he was completely versed and understood what was

14   in the plea agreement and what he was pleading guilty to.  I

15   also find that at this late date the government would be

16   prejudiced in locating its case in chief.  And for those

17   reasons I'm going to deny the motion to withdraw the guilty

18   plea, which will take us to the sentencing portion of this

19   case.

20             Ms. Byrd, I notice that there are several objections

21   that we need to be taking up before we get started dealing

22   with I guess -- let me ask you, what is left to be addressed?

23   I know that there was an objection to paragraph 46, I believe.

24   Let me read what I have as far as objections, and you can tell

25   me what have been resolved and which haven't.

1          Okay.  The first one I have is paragraph 46, also

2    paragraphs 50, 51, 53, 54 and 56, and that is all that I have

3    on my list.  Are there objections to other paragraphs?

4          MS. BYRD:  Well, I know I filed --

5          THE COURT:  I guess and what my stem from rulings on

6    those paragraphs.

7          MS. BYRD:  Well, yes, it would, but I -- in my

8    objection, I made it clear that my legal research and my

9    review of the file didn't yield an objection, but I wanted to

10   reserve it just in case Mr. Williams wanted to continue to

11   assert it.  And I have explained to him how the guidelines

12   work relative to paragraph 46 and why it is counted, and I

13   don't know if he's still objecting to it or not.

14         THE COURT:  Well, Mr. Williams, do you still want to

15   assert an objection as to paragraph 46?

16         THE DEFENDANT:  No.

17         THE COURT:  Okay.  Well, then I'll consider that

18   withdrawn.

19         MS. BYRD:  Okay.

20         THE COURT:  With regard to paragraph 50, 51, 53, 54

21   and 56 being considered predicate offenses for the career

22   offender application, paragraphs 50 and 51 are Class A

23   misdemeanors, and I don't think they were considered.

24         MS. BYRD:  I was at a bit of a disadvantage in

25   reviewing those, because the only thing I have to look at from

1    the prior representation was the PSR, because Mr. Cannon's

2    objections were never filed.

3              THE COURT:  Okay.

4              MS. BYRD:  At least I looked through the docket, and

5    so I only could see that version of it as reflected in the

6    PSR.  And from looking at that, the probation officer

7    addressed each one of them, and, in fact, most of them were

8    considered appropriate objections, and it got reflected in the

9    PSR.  And since the Court has allowed me time to speak with

10   Mr. Williams, I have presented him with the prior convictions

11   in Craighead County, that those two alone would qualify him as

12   a career offender, and he has indicated, unless he tells me to

13   the contrary, that he is no longer objecting to being

14   classified as a career offender.

15             THE COURT:  Is that correct, Mr. Williams?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Okay.  Well, then realizing where we

18   are, Ms. Byrd, does that resolve all of the objections to the

19   presentence report?

20             MS. BYRD:  Well, the plea agreement references three

21   issues that are -- have been reserved for the Court to

22   determine, although they are calculated in his sentencing

23   under the PSR, and that is whether or not he was running a

24   drug house, whether or not there were guns present and whether

25   or not -- what was the other one?  The guns, the residence

1    . . .

2          THE DEFENDANT:  Leadership.

3          MS. BYRD:  Yes, leadership role, organizer in this

4    conspiracy.  And those were the ones reserved for the Court to

5    determine that I believe you still want to move forward on?

6          THE DEFENDANT:  (Nods head.)

7          MS. BYRD:  He still wants to move forward on.

8          THE COURT:  Fair enough.

9          Mr. Williams, have you had a chance to go over the

10   presence report with Ms. Byrd?

11         THE DEFENDANT:  Uh, from when she saw me and she

12   sent me a copy of what she had went over, and we talked about

13   it over the phone.

14         THE COURT:  Well, I guess what I'm going to ask you

15   in light of what you told me so far, other than the issue of

16   your leadership role, whether or not you had possession of a

17   gun and whether or not you were operating a drug house, do you

18   have any other issue or problem with the presentence report?

19         THE DEFENDANT:  No, sir.

20         THE COURT:  Okay.  Well, then I'll accept the

21   uncontested facts as set forth in the presentence report, with

22   the exception of those three issues that we will resolve.  And

23   those are not exactly objections, but issues that were

24   reserved.  And so I won't refer to them as objections, but I

25   will realize that we have to do those before we calculate the

1    guideline range.  And so let me get, I guess, to that portion.

2           Mr. Gordon, what, if anything, do you want to

3    present to me to establish those three items or issues?

4           MR. GORDON:  Your Honor, with the Court's

5    permission, I'd like to call agent Cupp to address the issues

6    of leadership, possession of the gun and maintaining a drug

7    premises.

8           THE COURT:  All right.

9           Stephen Cupp, Governments' witness, sworn.

10          THE COURT:  You can have a seat up here.  It's up to

11   you if you want to remove your mask, so long as you're . . .

12          THE WITNESS:  If y'all can hear me okay, I'll try it

13   with the mask first.

14          THE COURT:  Your call.

15          MR. GORDON:  Judge, there's no microphone here.

16          THE COURT:  Wow, that's new.

17          MR. GORDON:  Shall I question from my seat?

18          THE COURT:  Well, there's one folded down behind

19   that monitor.  Can you move it over, and we'll just run with

20   that?  How about that?

21          MR. GORDON:  That's better.  Thank you.

22          THE COURT:  No idea what happened to the other one.

23   Glad to know it's wounded.

24                          Direct Examination

25   BY MR. GORDON:

1   Q     Good afternoon.

2   A     Good afternoon.

3   Q     Please state your name for the record.

4   A     Special agent Stephen Cupp.

5   Q     And how are you employed?

6   A     I work for the FBI, and currently assigned to Jonesboro,

7   Arkansas.

8   Q     How long have you worked for the FBI?

9   A     Since 2007.

10  Q     And how long have you been assigned to Jonesboro?

11  A     Since 2014.

12  Q     Where did you work before that?

13  A     Before that I worked for the FBI in Chicago, Illinois,

14  and on a gang squad; and before that I worked for the FBI in

15  Mobile, Alabama, working several types of violent federal

16  felonies; and then before that I was a police officer in

17  Conway, Arkansas, for approximately six and a half years.

18  Q     And what have your duties been while assigned to

19  Jonesboro?

20  A     Jonesboro I've largely worked narcotics and -- federal

21  narcotics and weapons violations.

22  Q     And were you the case agent assigned to the case against

23  Mr. Williams?

24  A     I was.

25  Q     And were you personally involved in this investigation?

1    A     Yes.

2    Q     From beginning to end?

3    A     Yes.

4    Q     I'd like to briefly address the three issues before the

5    Court, and let's start with the issue of leadership.  During

6    your investigation on this case, did you find any evidence

7    that Mr. Williams was directing the actions of at least one

8    other person?

9    A     Yes.

10   Q     Okay.  How many different people?

11   A     Specifically, between confidential informant reporting,

12   local law enforcement reporting, controlled buys and

13   surveillances to go along with them and Title III wire

14   intercepts, we found that Mr. Williams was leading a drug

15   trafficking organization involving Lakendra Thomas, his

16   girlfriend at the time; Izear Hall, who was distributing

17   narcotics for Mr. Williams at one of the -- 222 North Allis,

18   in Jonesboro, a drug distribution location; and his father was

19   also involved, Danny Ray Williams, Sr., and Timothy Peel, one

20   of his co-defendants.

21   Q     Okay.  So you believe Mr. Williams was directing the

22   actions of Mr. Peel, Mr. Hall --

23   A     Izear Hall.

24   Q     Mr. Williams' girlfriend?

25   A     Lakendra Thomas.

1    Q    At least those three, correct?

2    A    Correct.

3    Q    Okay.  Let's talk about Mr. Peel.  What evidence do you

4    have that Mr. Williams was directing the actions of Mr. Peel?

5    A    On some of the controlled buys we conducted we ordered

6    narcotics through Mr. Peel -- or, I'm sorry, through

7    Mr. Williams --

8    Q    Actually, before we get to those, let me -- sorry to cut

9    you off.

10   A    Sure.

11   Q    When the investigation started, did you receive any

12   source information about Mr. Peel and Mr. Williams?

13   A    We did.

14   Q    Okay.  And what was that information?

15   A    That they were working together distributing

16   methamphetamine and marijuana in the Jonesboro area.

17   Q    Okay.  And specifically did you receive information that

18   Mr. Peel worked for Mr. Williams?

19   A    Yes.

20   Q    Okay.  And during the investigation, did you develop any

21   evidence that supported the information that was first

22   reported to you?

23   A    We did.

24   Q    Okay.  Can you give us an example of that?

25   A    Sure.

1          Specifically during the Title III portion of the

2    investigation, we received wire intercepts on Mr. Williams'

3    phone that indicated that Mr. Williams had a source of supply

4    down on the Tex -- narcotics supply -- Texas -- uh, on the

5    Texas-Mexican border, and Mr. Williams was the one talking

6    directly to the suppliers.

7          And then in addition to that, whenever we ordered

8    the narcotics from Mr. Williams, often, or a couple of times,

9    Mr. Peel wound up doing the deliveries on behalf of

10   Mr. Williams.

11   Q    Okay.  Let's talk about two of those occasions.  Please

12   tell the Court about the purchase made on February 10th of

13   2017.

14   A    Sure.

15         February 10th, 2017, a confidential informant had

16   multiple contacts with Mr. Williams directly on that day, and

17   the contacts at our direction started on February 9th, and

18   then it got delayed until February the 10th.

19         On February the 10th, Mr. Williams agreed to sell an

20   ounce of meth for $650 to the confidential informant.  Later

21   that day, Timothy Peel started contacting the informant's

22   phone and eventually arrived and delivered the one ounce of

23   methamphetamine to the confidential informant and then was

24   paid the $650.

25   Q    Okay.  So that buy was originally set up between the

1    informant and Mr. Williams, but Mr. Peel is the one that

2    actually showed up and delivered the drugs?

3    A    Correct.  And the drug amount was a little short there,

4    but, yes, that's the occurrence of events.

5    Q    Okay.  And was there a similar buy on April 5th of 2017?

6    A    Correct.

7    Q    Tell us about that.  And before we get into the actual

8    buy, if you would back up to March 29th and April 4th and tell

9    us about how that buy was set up.

10   A    Okay.  March 29th, the confidential informant made a

11   recorded phone -- consensually recorded phone call to Danny

12   Ray Williams' phone number, his cellphone, and at our

13   direction, law enforcement direction, and the confidential

14   informant put the phone on speaker, so we heard both sides of

15   the conversation.  And during the call, the informant stated:

16   "I'm trying to see if I can get the same, uh, the same thing

17   for the same price, and I probably -- he probably wants two or

18   three, is that okay."  The story we had given the confidential

19   informant was the informant was buying narcotics for a

20   fictitious third-party customer, you know, just to make it

21   sound like it wasn't the informant buying it for law

22   enforcement.

23        Mr. Williams replied:  "Uh-huh," a positive reply.

24   And then the informant asked for a price, the same price, and

25   referring to the previous purchase, same price as the previous

1   purchase.

2           And then on April the 5th, the confidential

3   informant contacted Williams in order to schedule the

4   controlled purchase, sending a message saying:  "Maybe we can

5   hook up on the 5th," and Williams replied:  "Yeah."

6   Q    Okay.  Did Mr. Williams actually complete the drug deal?

7   A    On April the 4th, the confidential informant started

8   receiving text message -- or sending and receiving text

9   messages of both Timothy Peel and Danny Ray Williams, Jr., and

10  agents instructed the confidential informant to contact

11  Mr. Williams and set up the controlled purchase.  The text

12  messages Williams stated:  "I'll be there tomorrow."  And

13  then -- well, the confidential informant -- and in the Bureau

14  we call them confidential human sources and everywhere else we

15  call them confidential informants, so I keep going back and

16  forth.  The confidential informant stated:  I'll be there

17  tomorrow."

18          And so on April the 5th -- well, no, I'm sorry.

19  Later on April the 4th still, the confidential informant

20  received a message from Timothy Peel stating:  "This Tim, call

21  me."  The confidential informant replied to Peel with a

22  message saying:  "Okay, I'm at work right now, give me a few,

23  okay, or text me.  I'm glad you text -- texted, because I lost

24  all contacts and didn't have your number."

25          And then Timothy Peel replied with:  "DB said,"

 1   question mark, question mark.  And from our investigation, we

 2   learned that one of Danny Ray Williams Jr.'s street names,

 3   nicknames, was Danny Boy, probably for Danny, Jr.  And we

 4   instructed the informant to kind of clarify that a little bit

 5   more just to make sure we was talking about the controlled buy

 6   that we were trying to conduct through Danny Ray Williams, Jr.

 7   And Peel, Timothy Peel replied with a -- another text message,

 8   said, quote:  "He said you want two," unquote.  So that

 9   confirmed to us that, yes, that is the same conversation that

10   we was having with Danny Ray Williams, because that's how much

11   was ordered up with Danny Ray Williams over the phone.

12        And then the confidential informant replied:  "Yes,"

13   and then sent an additional text, said:  "1200 what I got

14   right now to bring with me."  And that was a little bit

15   different, because on the previous controlled buy it was 650

16   an ounce, and then so the informant was trying to negotiate

17   1200 total for two ounces, as opposed to 650 for one ounce.

18        And then Timothy Peel replied:  "When?"  The

19   confidential informant, since Timothy Peel didn't argue the

20   price, they assumed he was agreeable to the price and said --

21   and the confidential informant said:  "I got the money now,

22   I'll be there in the morning."

23        So on~-- also on April 4th, the confidential

24   informant -- so still April the 4th, the confidential

25   informant sent Danny Ray Williams a text message stating:

1    "You want this," dollar sign, dollar sign, "or am I dealing

2    with Tim for you so I'll know who to call?"  Williams, Danny

3    Ray Williams, replied:  "Call him."  So he was saying, keep

4    dealing with Timothy Peel on this, the rest of this drug

5    transaction.

6            Then on April the 5th there was a series of text

7    messages between Timothy Peel and the confidential informant,

8    and they arranged to meet at a grocery store and conduct the

9    transaction.

10   Q    Okay.  Now, you testified that Mr. Williams also directed

11   the actions of a Mr. Hall.  Who is Mr. Hall?

12   A    Izear Hall also went by Guwop; was a subject in

13   Jonesboro --

14   Q    Hang on.  G-u-w-o-p?

15   A    Correct.

16   Q    Okay.  Who is Guwop?

17   A    He's a subject in Jonesboro that stayed at 222 North

18   Allis and distributed drugs for Mr. Danny Ray Williams, Jr.

19   Q    Okay.  And Allis is A-l-l-i-s?

20   A    Correct.

21   Q    Okay.  And at the conclusion of this investigation, did

22   you interview Mr. Hall?

23   A    We did.

24   Q    After rights advisement?

25   A    We did.

1    Q    And did he admit that he was selling drugs for

2    Mr. Williams out of the residence located at 222 Allis?

3    A    He did.

4    Q    And during the wiretap, did you intercept a phone call

5    between Mr. Williams and another person in which Mr. Williams

6    directed that person to have a stolen gun -- to have a gun

7    brought to the house at 222 Allis, where Guwop would pay them

8    for the gun?

9    A    Correct.

10   Q    And we'll get into that more in just a moment.

11           And during the wiretap, did you also intercept phone

12   calls, repeated phone calls, where Mr. Williams was directing

13   people to the house at 222 Allis in order to purchase drugs?

14   A    Correct.

15   Q    And we'll cover that in more details shortly, as well.

16           Let's talk about Lakendra Thomas.  Who is she?

17   A    Lakendra Thomas at the time was Danny Ray Williams, Jr.'s

18   girlfriend and the mother of multiple children with him, I

19   believe.

20   Q    Okay.  Did she reside with Mr. Williams during this

21   investigation?

22   A    She did.

23   Q    Was that at a house located at 1107 Warner?

24   A    Correct.

25   Q    In Jonesboro?

```
 1  A     Yes.

 2  Q     And what evidence do you have that Mr. Williams was

 3  directing the actions of Ms. Thomas?

 4  A     We had confidential informant information saying she was

 5  involved in delivering drugs for Mr. Thom -- for Mr. Danny Ray

 6  Williams.  And then we also, during the Title III on Danny Ray

 7  Williams' phone, we had intercepted phone calls where he was

 8  correcting her to deliver narcotics, along with directing her

 9  to collect cash from the 1107 Warner address in a safe there,

10  and send Western Union money transfers to who we believe was

11  his drug supplier down the Texas and Mexico border.

12  Q     Okay.  If you would tell the Court a little bit more

13  about the intercepted phone calls where Mr. Williams is

14  directing her to pay some people in Mexico.

15  A     Sure.

16        We intercepted several phone calls from who we

17  believe was a drug supplier, and they were talking about --

18  they were using code words; they were talking about marijuana

19  and methamphetamine.  And several of the phone calls was the

20  supplier prying to get payments out of Mr. Williams.  And

21  eventually Mr. Williams reached out to Lakendra Thomas over

22  the phone, and we intercepted the phone call, for her to make

23  I believe it was a $950 payment via Western Union, and gave

24  her specific instructions on who to send the money to.

25  Q     Okay.
```

```
 1  A    And then our surveillance officers followed her to a
 2  Wal-mart in Jonesboro, watched her go up to the Western Union
 3  counter and conduct business there.  And then after, after
 4  that happened, Mr. Williams texted the Mexican supplier a
 5  confirmation number that we believe was the Western Union
 6  confirmation, wire transfer.
 7  Q    Okay.  And so if you have -- do you recall doing a search
 8  warrant in this case?
 9  A    We did.  We did two search warrants, one at 1107 Warner,
10  and then one at 222 North Allis.
11  Q    Okay.  And I'll direct you to paragraph 32 of your
12  affidavit.
13  A    Okay.  It was a $900 payment.
14  Q    Thank you.
15           On April 29th of 2017?
16  A    Correct.
17  Q    And Mr. Williams directed her to wire the payment to Juan
18  Jose Trevino, Jr.?
19  A    Correct.
20  Q    In fact, that's a person that he was communicating with
21  who was asking for that $900 from him?
22  A    Exactly.
23  Q    And you intercepted phone calls between Mr. Williams and
24  Mr. Trevino indicating that that was his drug source?
25  A    Yes.
```

1    Q    And then Ms. Thomas did actually go and deposit those

2    $900?

3    A    Wire transfer, yes.

4    Q    Thank you.

5         And then you also mentioned something about her

6    being involved in Mr. Williams' drug distribution.  Will you

7    tell us about that?  Specifically, a wire call that we

8    intercepted.

9    A    Specifically, so the wire transfer happened on April

10   the 29th, 2017.

11        On May the 6th, 2017, Danny Ray Williams, Jr., had

12   Lakendra Thomas get a quarter pound from the safe -- we

13   believe it was a quarter pound of marijuana -- and deliver it.

14   There was other phone calls around the one between

15   Mr. Williams and Lakendra Thomas that Marcus Hunter was

16   looking for narcotics at that time.  So we believe that's who

17   the end customer was.  We were not able to surveil that

18   delivery.

19        And then on May the 15th, on May the 15th, Lakendra

20   Thomas also -- Danny Ray Thomas -- at Danny Ray Williams,

21   Jr.'s directions makes another $800 payment to the same

22   Mexican supplier, Mr. Trevino, through Wal-mart, or at a

23   Wal-mart location through Western Union, actually.

24   Q    I want to go back to that text message between

25   Mr. Williams and Ms. Thomas.

1   A     On April the 29th?

2   Q     May 26th.

3   A     May 26th, okay.

4   Q     2017, at 11:33, did he text Ms. Thomas and tell her,

5   quote:  "Can you get a QP fo me at the house in the safe?"

6   A     Stand by.  Let me find the actual text here.

7   Q     It's paragraph 34 of your affidavit, if you have that

8   handy.

9   A     Okay.  Yep.

10  Q     And "QP," is that commonly known in your profession to be

11  a -- an abbreviation or shorthanded --

12  A     It is.  It's a common slang term for a quarter pound, an

13  amount of narcotics.

14  Q     Okay.  And frequently, "QP" is for a quarter pound of

15  marijuana?

16  A     Oftentimes, yes.

17  Q     Okay.  And so he's asking her to get a QP out of the safe

18  in the house for him, correct?

19  A     Correct.

20  Q     We'll jump ahead real quick.

21        Eventually did you do a search warrant on the house?

22  A     We did a search warrant of both the Allis location and

23  1107 Warner.

24  Q     Okay.  And for now, the house that he's talking about in

25  this text, did you find marijuana in the safe in that house?

1    A    We did.

2    Q    Okay.  And we'll come back to that.

3    A    Okay.

4    Q    Let's move on to the second issue of guns.  During the

5    wiretap on Mr. Williams' phone, did you intercept a phone call

6    about someone delivering a gun to the house on Allis?

7    A    We did, yes.

8    Q    If you would please tell the Court about that phone call.

9    A    Okay.  On April the 22nd, 2017, we intercepted a phone

10   call incoming to Mr. Williams' cellphone, and the unknown male

11   on the other end of the phone stated:  "Hey, little momma,

12   gonna call you for that, uh, that pistol."  Later in the

13   conversation, Mr. Williams said:  "Yeah, I'm at the crib.

14   Just have her to go over to, uh, Allis.  I'm gonna have Guwop

15   give her the money out of the bag."  And then the unknown male

16   said:  "On Allen?"  And Williams clarified:  "On Allis, 222

17   Allis."

18   Q    Okay.  And, again, 222 Allis is where Guwop, Mr. Hall,

19   stayed --

20   A    Correct.

21   Q    -- distributed drugs for Mr. Williams?

22   A    Correct.

23   Q    And eventually was a search warrant executed on that

24   house?

25   A    It was.

```
1   Q    During the execution of that search warrant, were any

2   firearms located?

3   A    Yes, there was two firearms located at 222 North Allis.

4   Q    Okay.  And how many --

5   A    Specific --

6   Q    Hang on.

7             How many people were living in that house on Allis?

8   A    We believe two people were actually permanently living

9   there, Izear Hall and Derrick Moten.

10  Q    Okay.

11  A    At the time of the search warrant, Danny Ray Williams'

12  father, Danny Ray Williams, Sr., was present at the residence.

13  It was early in the morning.  We think he stayed there that

14  night.

15  Q    And did you, in fact, talk to Mr. Williams' father about

16  why he was there and how often he was there?

17  A    We did, and he said he frequented there.

18  Q    He frequented there?

19  A    Yeah, he was often there.

20  Q    Okay.  There are two bedrooms in the house, correct?

21  A    Yes.  And at the time, when -- in the morning he was

22  located in the front bed, which belonged to Izear Hall.

23  Q    And during the execution of the search warrant, what was

24  found in that bedroom?

25  A    In Mr. Hall's bedroom was a Mossberg 702 Plinkster rifle,
```

1    also a container with approximately 2.3 grams of cocaine base,

2    a -- baggies containing approximately 7.4 ounces the

3    marijuana, a digital scale, several baggies containing

4    approximately 1.33 ounces of marijuana, three baggies

5    containing approximately 8.9 grams of cocaine, and then

6    another baggy containing approximately .6 grams of

7    methamphetamine.

8    Q    In the second bedroom, whose bedroom was that?

9    A    The second bedroom belonged to Derrick Moten.

10   Q    Also known as?

11   A    Mississippi.

12   Q    What did you find in that room?

13   A    In Mr. Moten's bedroom we found a stolen Ruger SR40c

14   pistol.  It was loaded with eight rounds.  Or, well, I'm

15   sorry, there was a magazine next to it that had eight rounds

16   in it.  So the magazine was actually out of the pistol.  We

17   also found approximately 11.3 grams of methamphetamine,

18   approximately 2.2 grams of cocaine, and approximately

19   1.5 ounces of marijuana.

20   Q    Okay.  Thank you.

21        And before we leave this topic, you mentioned

22   Charles Moten, Mississippi.

23   A    Derrick Moten.

24   Q    Derrick, sorry.

25        During the interception of Mr. Williams' phone, did

1  you hear any communication between the two men indicating that

2  Mr. Moten worked for or with the defendant distributing drugs?

3  A    We did.  We intercepted some phone calls between

4  Mr. Moten and Danny Ray Williams, Jr., and narcotic business

5  was being discussed.  Specifically during that time, or during

6  the time of our Title III, Guwop, Izear Hall, had been

7  arrested, and they talked about how Mr. Hall stored his

8  narcotics and specifically separated the different types of

9  narcotics, and they also -- or during that time, we also

10 intercept a phone call where Derrick Moten was asking for I

11 believe it was a half a brick from Danny Ray Williams, but at

12 the time, Danny Ray Williams said he didn't have it.

13 Q    Okay.  And you believe that based upon your training and

14 experience and the context of this investigation, half a brick

15 is a reference to?

16 A    A half pound of marijuana.

17 Q    All right.  Let's move on to the third topic, which is

18 maintaining a drug premises.  There were -- were there two

19 residences that you were watching during this investigation?

20 A    Correct, two -- 1107 Warner, in Jonesboro, which is where

21 the investigation revealed that Danny Ray Williams and

22 Lakendra Thomas lived.  And to talk about the safe, when we

23 did the search warrant, that's where the safe was located.

24 There was marijuana and money stored in the safe.

25          And then the second residence was 222 North Allis,

1   in Jonesboro that the investigation revealed was a house for

2   distribution.  We had a camera surveilling it, and then we

3   also conducting physical surveillance, and then the Title III

4   supported that, as well.

5   Q    Okay.  Let's talk about the evidence you obtained through

6   the pole camera.

7   A    Okay.

8   Q    What could you see through the pole camera?

9   A    Specifically it was a house that had a high volume of

10  traffic, a lot of people would come and go for very, very

11  short durations, sometimes less than two minutes.  We observed

12  vehicles go up and somebody get out of the car, go inside, and

13  a very short time later come back and --

14            MS. BYRD:  Your Honor, may I interrupt?

15            Which residence are we talking about with the high

16  volume of traffic that he's --

17            MR. GORDON:  Allis.

18            MS. BYRD:  Okay.

19            THE WITNESS:  Yes, 222 North Allis.

20            And that activity is consistent with narcotics

21  trafficking, being a distribution house where people go to buy

22  drugs.

23  BY MR. GORDON:

24  Q    Okay.  So, and, sorry, you mentioned people would come,

25  go into the house --

1    A    Yes.

2    Q    -- stay for just a moment and then leave?

3    A    Oftentimes, yes.  Obviously some people would come and

4    stay for longer periods of time, but there was a high volume

5    of traffic coming for very short periods of time.  And then

6    sometimes in addition to that, sometimes people would come

7    from inside the house and walk out, talk to the people in the

8    vehicle for a very short amount of time, and then go back in.

9    Also, based on training and experience, indicative of drug

10   trafficking.

11   Q    Okay.  And in addition to that, you also have Mr. Hall,

12   who said, I was living in that house selling drugs for

13   Mr. Williams?

14   A    That's correct, yes.

15   Q    Okay.  That house, did you check, do you know who owned

16   that house?

17   A    It was a rental, and I believe it's something like PK

18   Investments, in Jonesboro, for 222 North Allis.

19   Q    Okay.  And do we know who actually -- whose name was on

20   the lease?

21   A    I don't know whose name was actually on the lease.

22   Q    Okay.  What evidence did you have from the wiretap of

23   Mr. Williams' phone that Allis was actually being used as a

24   drug distribution house?

25   A    We intercepted several phone calls where a drug customer

would contact Mr. Danny Ray Williams and order up narcotics,
and he would refer them to the house on North Allis, to
specifically 222 North Allis.

Q    Would you give us some examples of those phone calls,
please?

A    Yes.  You want me to just go through them, or are you
going to ask?

Q    Go ahead and go through them.

A    Okay.

Q    Starting with paragraph 26 of your affidavit.

A    Okay.  On or about April the 22nd, 2017, we intercepted a
phone call coming -- calling into Danny Ray Williams' phone.
During the conversation, Mr. Williams said:  "But you gotta
get the green," believed to refer to marijuana, "from you, you
gotta get the green from Allis."  So he's saying -- he's
telling the caller, who we identified as Bershawn (phonetic)
Henry, to go to Allis Street, to the house on Allis Street, to
get the marijuana.

Q    Okay.

A    Then later on that day is a phone call we referenced
about the pistol.  April 22nd, 2017, we intercepted a phone
call from an unknown male who stated:  "Hey, um, little momma,
gonna call you for that pistol."  And then later in the
conversation, Ms. (sic) Williams said:  "Yeah, I'm at the
crib.  Just have her go to, uh, Allis.  I'm gonna have Guwop

1    give her the money out of the bag."  The unknown male said --
2    again, said:  "On Allen?"  And Mr. Williams clarified:  "On
3    Allis, 222 Allis."
4    Q    Okay.  Let's jump ahead to paragraph 29.
5    A    On April the 24th, 2017, we intercepted another phone
6    call.  During the phone call, again, with Bershawn Henry and
7    Mr. Danny Ray Williams, Mr. Henry stated:  "Man, I need a, a
8    half," and we believe that to refer to a quantity of
9    narcotics.  And then he said:  "I come past there in a bit,
10   try to get off work."  So he said he was trying to get off
11   work and was going to come by in a little bit.  And
12   Mr. Williams replied:  "All right.  You gotta go to Allis,"
13   referring to the location on 222 North Allis.
14         On April the 25th, 2017, we intercepted two phone
15   calls between an unknown male and Mr. Williams.  During those
16   calls the unknown male stated:  "Trying to get a half."  And
17   later in the conversation, Mr. Danny Ray Williams stated:
18   "I'm on Allis."  And then the unknown male later on asked:
19   "What's the address on Allis, Sam?"  And Mr. Williams stated:
20   "222 Allis."
21         On April the 28th, 2017, another intercepted phone
22   call on Mr. Williams' cellphone.  During the call Mr. Williams
23   said:  "What you trying to get?"  The unknown male responded:
24   "What you do for half, 30," asking if he was charging 30 for a
25   half.  Mr. Williams responded:  "Yep."  And the third -- or

1    the unknown male stated:  "Well, shit, that's what I was

2    trying to grab."  And Mr. Williams said:  "Ah, come on to

3    Allis Street."

4    Q    Jumping ahead to paragraph 33, please.

5    A    Thirty-three, yep.  On May the 2nd, 2017, another

6    intercepted phone call on Danny Ray Williams' Title III, or

7    the phone that we was doing the Title III on.  The unknown

8    female caller asked:  "You straight on some loud?"  And in the

9    drug world, "loud" is a common term for marijuana.

10   Mr. Williams replied:  "Yeah."  And then she asked:  "Uh, what

11   you let go a quarter for," meaning like either a quarter ounce

12   or a quarter pound, one of the two.  Mr. Williams replied:

13   "For 80."  So based on the price, we assume that was a quarter

14   ounce.  And the female said:  "Uh, where you at?"  And then

15   Mr. Williams replied:  "I'm on, uh, you gotta come to Allis."

16   And then she stated:  "Uh, all right."  And then Mr. Williams

17   clarified:  "It's 222 Allis."

18   Q    Paragraph 35.

19   A    Paragraph 35.  On May the 8th, 2017, again we intercepted

20   another phone call on Mr. Danny Ray Williams, Jr.'s phone

21   between Mr. Williams and Bershawn Henry.  During the call

22   Mr. Henry stated:  "Hey, hey, just what you call it, cuz, just

23   let me get a -- just let me get a half until tomorrow of

24   Reggie."  And "Reggie" is another common slang term for

25   marijuana.  And Mr. Williams responded:  "All right.  You

```
 1  gotta go on Allis."  So he directed Mr. Henry again to the 222
 2  North Allis location.
 3  Q    And last one.
 4  A    On May the 10th, 2017, another intercepted phone call on
 5  Mr. Williams' phone.  During the call, again, Bershawn Henry
 6  stated:  "Hey, uh, bring me a half when you come up here."
 7  And Mr. Williams responded:  "No, I ain't got no half.  You
 8  owe me $75."  And Mr. Henry responded:  "I owe, oh, yes, I do,
 9  okay, but that ain't got nothing to do with this, ain't got
10  nothing to do with this, uh, for somebody else, cuz, uh, man,
11  just bring the shit, I got it."  We believe that was referring
12  to a payment for narcotics.  And Mr. Williams responded:  "I'm
13  not traveling with it."  We believe that to mean he was not
14  wanting to travel with the narcotics.  And Mr. Henry said:
15  "What the fuck?"  And then Mr. Williams said:  "I'm on Allis."
16  And Mr. Henry said:  "All right."
17  Q    During the investigation, did you make any buys from
18  Mr. Williams at Allis?
19  A    We did.
20  Q    Okay.  Tell us about that one.
21  A    On that one we had a confidential informant reach out on
22  May the 25th and order up two ounces of methamphetamine from
23  Mr. Williams.
24  Q    May or April?
25  A    I'm sorry, April 25th, 2017.
```

1          And Mr. Williams said he was good.  And ultimately

2    the confidential informant was directed to 222 -- three

3    twos -- 222 North Allis, in Jonesboro, the same location we've

4    been talking about as a drug distribution house for

5    Mr. Williams.  And there Mr. Williams was present, Izear Hall,

6    a/k/a Guwop, was present.  And then the confidential informant

7    went inside with a hidden camera, and Mr. Williams provided

8    two ounces to the confidential informant that was stored in a

9    freezer in the kitchen, and then the confidential informant

10   paid $1300 for the two ounces.

11   Q    And what did the informant get for $1300?

12   A    It turned out it was not -- it was not actually meth.  It

13   was fake, fake dope.

14   Q    Two ounces of something?

15   A    Whatever, yeah.

16   Q    Okay.  And so that's why that one was not charged?

17   A    Correct, yes.

18   Q    Okay.  All right.  Let's go ahead and wrap up by talking

19   about the house on Warner.  Did you execute a search warrant

20   on that house?

21   A    Yes.  On May the 16th, 2017, we executed a federal search

22   warrant at 1107 Warner.

23   Q    And, again, that's the house where Mr. Williams lived

24   with Lakendra Thomas?

25   A    That's correct, yes.

1   Q     And what'd you find?

2   A     During the execution of the search warrant, we found a

3   digital scale in Mr. Williams' bedroom, we found two clear

4   plastic baggies with suspected marijuana in the bedroom, also

5   a hand-rolled cigarette we believe also contained marijuana,

6   and both of those items were on top of the safe in

7   Mr. Williams' room, $198 was found in a vehicle, the gold Ford

8   Expedition in the driveway of the residence.  Also, $263 was

9   found in a pair of men's jeans located in Mr. Williams'

10  bedroom, on the floor I believe.  And then in addition to

11  that, Mr. Williams said there was about $3000 in the safe, and

12  in the safe we found $3790 and approximately 7.8 ounces of

13  marijuana and an additional 2.4 ounces of marijuana packaged

14  separately.

15  Q     And during the wiretap, did you also intercept calls in

16  which people were coming to the house on Warner to purchase

17  drugs?

18  A     Yes.  Not near the frequency as the calls we intercepted

19  with -- to Mr. Williams that where he directed them to 222

20  North Allis, but we did receive calls where they were

21  obtaining drugs from 1107 Warner.

22  Q     And then through surveillance, you would actually see the

23  people arrive at the house and then leave?

24  A     Correct.

25         MR. GORDON:  Okay.  Thank you.  I have no further

```
 1   questions.
 2                         Cross-Examination
 3   BY MS. BYRD:
 4   Q    Mr. Cupp, is it?
 5   A    Yes, ma'am.
 6   Q    Now, the house on Warner, 1107 Warner, do you know who
 7   owned or who leased -- or who's on the lease for that
 8   residence?
 9   A    I know Lakendra Thomas was paying utilities there.  The
10   utilities were in her name.  The actual ownership slash lease
11   I don't know off the top of my head.
12   Q    Okay.  And you indicated there was not nearly as much
13   traffic going on on the Warner address as the 222 Allis?
14   A    Correct.
15   Q    Do you know if, on the Warner address, were any of the
16   individuals you have identified as being directed by
17   Mr. Williams, were they going in and out of Warner?
18   A    Lakendra Thomas was, yes.
19   Q    Was she the only one?
20   A    She's the only one we observed on any frequency going in
21   and out of Warner.
22   Q    She lived there, didn't she?
23   A    Correct, yes.
24   Q    With the children, am I correct?
25   A    Yes.
```

```
1    Q    Okay.  So that was her residence, as well.

2    A    Correct.

3    Q    So she went in and out because she lived there, as well,

4    correct?

5    A    And to get drugs, yeah.

6    Q    And she did what?

7    A    And to get drugs, yes.

8    Q    Did you -- did people make purchases of drugs from her on

9    the Warner address?

10   A    We intercepted a phone call that I referenced earlier

11   about the quarter pound, and the collective phone calls

12   indicated that she delivered the quarter pound to a gentleman,

13   and I don't know where that delivery actually took place.

14   Q    But it wasn't at Warner, was it?

15   A    Well, I don't know.  I don't know where the actual

16   delivery took place.

17   Q    Okay.  So you don't know where it was.

18   A    Mr. Will -- exactly.  I don't know where it went, to

19   answer your question.  Mr. Williams took the call and then

20   directed her to go get it out of the safe, and then I'm not

21   sure where she actually made the delivery.

22   Q    Did Mr. Williams ever direct calls for -- that you picked

23   up on the wiretaps or text messages whereby individuals that

24   you've identified as part of his conspiracy or that he

25   directed, where they were meeting people at the Warner Street
```

1    address buying or picking up drugs?

2    A    Picking up drugs, yes, and then picking up drug proceeds,

3    yes.

4    Q    But let's make it two parts.  They would pick up drug

5    money?

6    A    And drugs, yes.

7    Q    And drugs.

8         Do you know what quantities of drugs and --

9    A    Well, specific --

10   Q    -- how often?

11   A    Not -- again, not near as often as the Allis Street, but

12   the one example that comes to mind is the quarter pound that

13   he had -- Mr. Williams had Lakendra Thomas pick up from the

14   1107 Warner address.

15   Q    Now, in terms of these wiretaps and the text messages,

16   did you ever have any wiretaps or intercept any text messages

17   between Mr. Williams and his father?

18   A    Yes.

19   Q    And what did he direct his father to do?

20   A    There was -- it wasn't completely clear what he was going

21   to recover, but it appeared that Mr. Williams, Danny Ray

22   Williams, Jr., was directing Mr. Danny Ray Williams, Sr., to

23   pick something up out of we believe it was the Allis house,

24   but we weren't sure.

25   Q    Do you know what he was to pick up?

```
1    A    Um, not exactly, no.

2    Q    Okay.  Now, did you have wiretaps between or intercept

3    any calls or text messages between Mr. Williams and these

4    other members where they are discussing any scheme or plan to

5    sell drugs?  I mean, you've talked about some people, but did

6    you have wiretaps on these other individuals, or was it just

7    Mr. Williams?

8    A    The wiretap was only on Mr. Williams' one cellphone that

9    we had.

10   Q    Okay.

11   A    But we intercepted the conversations between Mr. Williams

12   and the other people we talked about.

13   Q    So you never intercepted any conversations between any of

14   these other people on their phones, only in relationship to

15   Mr. Williams.

16   A    Well, we also did controlled buys with Timothy Peel, so

17   we had conversations we intercepted through consensually

18   recorded phone calls with the informant and Mr. Peel.  So that

19   would not have involved Mr. Williams' phone.  But other than

20   that, the only phone calls we intercepted was Mr. Williams off

21   of Mr. Williams' phone.

22   Q    So you didn't have Ms. -- was it Ms. Thomas?

23   A    Correct.

24   Q    You didn't have her phone or anything wiretapped?

25   A    No.
```

```
 1   Q    Nor Mr. Williams' father, Danny Ray Williams, Sr.?

 2   A    We did not.

 3   Q    And you didn't have a wiretap on Mr. Peel?

 4   A    Correct.

 5   Q    And who was it, Mr. Hall?

 6   A    Izear Hall, yes, ma'am.

 7   Q    And then a Mr. Moten?

 8   A    Correct.

 9   Q    Okay.  So you didn't have any wiretaps on them?

10   A    Correct.

11   Q    So other than knowing what came -- what was on wiretaps

12   between Mr. Williams, through Mr. Williams, you don't know

13   what the conversations were like between the people I just

14   mentioned who you allege worked for him or was a part of who

15   he led; am I correct?

16   A    Correct.  We only intercepted the calls that went across

17   Mr. Williams' phone.

18   Q    So you have no way of knowing whether or not any of these

19   people operated independently of Mr. Williams, do you?

20   A    Well, we have evidence that Mr. Williams was directing

21   them to deliver drugs, and other customers, he was directing

22   those customers to go buy from people he was supplying.

23   Q    But my question is:  Do you know whether or not any of

24   the people I just named operated independently of

25   Mr. Williams?
```

1   A     No, they could absolutely do stuff independent of

2   Mr. Williams, in addition to doing stuff for Mr. Williams.

3   Q     Well, but you don't have any proof that they weren't

4   independent operators, while at the same time maybe also

5   working with Mr. Williams?

6   A     It is possible they had like -- I think I understand what

7   you're asking.  It's possible they had a side business and

8   doing their own thing in addition to what they was doing with

9   Mr. Williams, yes.  Is that --

10  Q     Well, when you say side business, you don't know how much

11  business they may have been doing, do you?

12  A     Correct, no.  Just what we intercepted on Mr. Williams'

13  phone, and then the controlled buys, and then what was

14  recovered in the search warrants.

15  Q     And in your affidavit, that was a discrete number of

16  interceptions, weren't there?

17  A     What do you mean by discrete?

18  Q     Well, in your affidavit there were dates, times and

19  individuals who were working undercover who were being

20  directed for purchases and so forth.

21  A     Correct, yes.

22  Q     But I guess what I'm getting at is that -- I'm losing my

23  train of thought -- is that if these people were working -- if

24  the people you claim Mr. Williams was directing was working

25  independently of him, and whatever quantity and however

1    extensive, you wouldn't have any knowledge of that, would you?

2    All you know is what they did in relationship to Mr. Williams.

3    A    Correct.

4    Q    And do you know what the parameters of what these people

5    agreement was with Mr. Williams in terms of who did what, how

6    much money was being divided up, who took what role?  Do you

7    know anything about that?  Do you know -- hear any discussions

8    between them dealing with what role they each may have had?

9    A    I would describe the role generally as Mr. Williams was

10   supplying narcotics to the people I named, and they sometimes

11   were collecting money and then serving customers on behalf of

12   Mr. Williams.  But as far as anything very specific outside of

13   that, no, I don't.

14   Q    So you don't know if there were people who did not go

15   through Mr. Williams but that did transactions with these

16   other people?

17   A    No, I don't know.  And I would assume there is, but I

18   don't know.

19   Q    Now, you also mentioned that in terms of the drug

20   premises, you didn't know who was on the lease for 222 Allis;

21   is that correct?

22   A    Correct, yes.

23   Q    And did you find any guns on the Allis premises?  Oh, no,

24   I should -- let me back that up.  Did you find any guns on the

25   Warner Street premises?

```
 1   A    Warner, no; Allis, yes.

 2   Q    No, but I was only asking you about Warner.

 3   A    Warner --

 4             THE COURT:  You kinda asked him both, but I think he

 5   made it clear that there was none at Warner.

 6             MS. BYRD:  Okay.

 7             THE WITNESS:  Correct.

 8   BY MS. BYRD:

 9   Q    All right.  Now, as to the Allis address, you indicated

10   that you found a gun in Mr. Hall's bedroom, the Mossberger?

11   A    Correct, Mossberg.

12   Q    Mossberg?  I'm not good on gun names.  Okay.

13   A    Understandable.

14   Q    And then in Derrick Moten's room there was a stolen

15   Ruger?

16   A    That's correct.

17   Q    Did you find any other weapons at 222 Allis?

18   A    Those two were it.

19   Q    Okay.  Now, do you know if the gun that Mr. Hall had, was

20   it purchased or anything?

21   A    We ran ATF trace reports on them.  I don't remember off

22   the top of my head.  It was not reported stolen, so at some

23   point it was legitimately purchased from a licensed FFL

24   dealer.  I don't remember the specifics on that, though.

25   Q    Do you know from your wiretaps if the guns for Mr. Hall
```

1  was intended for Mr. Williams?

2  A    Are you asking about the -- we cited a call from the

3  wiretap earlier where a gun was purchased by Mr. Williams and

4  delivered to Mr. Hall.  Is that the one you're asking about?

5  Q    Is this the Mossberg?

6  A    No.

7        So, okay, if you're asking about that phone call,

8  the phone call referred to a pistol.  The Mossberg is a rifle.

9  Q    Okay.  Did you find the pistol?

10  A    Well, we found a pistol, and that was a stolen one in

11  Derrick Moten's --

12  Q    That's the Ruger.

13  A    Correct.

14  Q    And do you know if that gun was for Mr. Williams' use or

15  for Mr. Moten's use?

16  A    I don't know.

17  Q    And what about the weapon that was found in Mr. Hall's

18  bedroom?  You said you couldn't determine -- you didn't

19  determine if it was stolen.  May have been --

20  A    Correct.  It was not --

21        THE COURT REPORTER:  Excuse me, please.  Repeat your

22  question.

23  BY MS. BYRD:

24  Q    The gun in Mr. Hall's bedroom, you said you didn't find

25  that it had been stolen, it may have been purchased

1  legitimately?

2  A    At some point it was purchased legitimately.

3  Q    Okay.

4  A    It was not reported as stolen.  A lot of times, too -- I

5  mean, not saying this is necessarily the case here, but people

6  don't record their serial numbers, so guns get stolen.  So I

7  can't definitively say it was not stolen, but I can say it was

8  not reported as stolen.

9  Q    But do you know if that gun was intended for or used or

10  possessed by Mr. Williams?

11  A    No.  The -- our assessment of it was that both firearms

12  were there to protect the drug house.

13  Q    And Mr. Williams did not live at that house, though?

14  A    Correct, he did not live there.  He lived at the Warner

15  address.

16           THE COURT:  Ms. Byrd, may I ask a question?

17           MS. BYRD:  Sure.

18           THE COURT:  The conversation about the weapon that

19  you intercepted with Mr. Williams, who is he speaking with?

20           THE WITNESS:  It was an unknown male.  We did not

21  identify that male that he was speaking with.

22           THE COURT:  So you don't know if it was Moten or the

23  other guy --

24           THE WITNESS:  Well, we don't --

25           THE COURT:  -- just somebody talking about a pistol?

```
 1            THE WITNESS:  We don't think it was Moten, because
 2    we had Moten's number that Moten was frequently talking to
 3    Mr. Williams on.  It is possible Moten had a different number,
 4    we just didn't recognize that as Moten's voice, so we don't
 5    think that was the case.  We think it was just a -- another
 6    customer that we just didn't know who it was.
 7            THE COURT:  Okay.
 8    BY MS. BYRD:
 9    Q    Well, did that gun ever show up in Mr. Williams'
10    possession or in either of these residences?
11    A    Well, that gun was just described as a pistol.  And,
12    again, there was a pistol recovered at the 222 North Allis
13    address, but we can't say definitively it was or was not the
14    same pistol that was talked about being purchased by
15    Mr. Williams.
16    Q    Any of these weapons could have been there way prior to
17    this phone call?
18    A    Yes, they could have.
19    Q    Now, you mentioned a Marcus Arnold that --
20    A    Can you remind me what was the context that his name came
21    up?
22    Q    I just have his name, and you were discussing him in
23    relationship to the leadership role that was alleged that
24    Mr. Williams played.
25    A    There was somebody I mentioned earlier, it may have been
```

```
1   him, that we identified as one of the callers on the phone,
2   but I don't think I described him as being led by
3   Mr. Williams.  I think he was just a drug customer.  Steve
4   Anderson I think is who I talked about earlier.
5   Q    Okay.  I have a Marcus Arnold.
6              THE DEFENDANT:  Marcus Hunter.
7              THE COURT:  Ms. Byrd.
8              MS. BYRD:  Pardon me.  Excuse me, Your Honor.
9              THE DEFENDANT:  He said Marcus Hunter.
10             THE COURT:  Yes.  He was trying to get your
11  attention.  I was just doing it for him.
12  BY MS. BYRD:
13  Q    Okay.  I believe the name is Marcus Hunter, and I believe
14  that you may have testified that he was someone that
15  Mr. Williams may have directed in terms of the sale or
16  transactions.
17  A    He may have been one of the interceptees, a drug
18  customer.  I don't remember his -- where he fit into it at the
19  moment.
20  Q    Was he part of the -- you don't know if he was anyone
21  that was directed by Mr. --
22  A    He was not one of the ones I listed as directed, no.
23  Q    So if he -- so he was a customer or someone --
24  A    Possibly, yes.
25             THE COURT REPORTER:  Sir, sir, please wait for the
```

1  question to be finished.

2  BY MS. BYRD:

3  Q    You can go on.

4  A    Okay.  I found where his name came up.

5        On May the 16th, 2017, we intercepted phone calls

6  where Danny Ray Williams was directing Lakendra Thomas to get

7  a quarter pound from the safe, and the safe, again, was at

8  1107 Warner, where they lived.  And that quarter pound we

9  believe was for Marcus Hunter.  I'm sorry, I had forgot that

10  name.

11  Q    Do you know whether or not Mr. Hunter was incarcerated at

12  the time?

13  A    I don't know that, and I -- we -- it's -- anytime you do

14  a Title III, it's a struggle to try to identify the users of

15  the phones.  We usually do it through surveillance and then

16  checking, like, law enforcement databases or commercial

17  databases.  We never charged or even attempted to charge

18  Marcus Hunter.  So we probably had a preliminary

19  identification of him, and since we didn't try to charge him,

20  we didn't pursue it any further.

21  Q    Okay.  And the people that you have, again, identified as

22  being directed by Mr. Williams, with the exception of

23  Mr. Peel, who was I believe at some point indicted as a

24  co-conspirator with Mr. Williams; am I correct?

25  A    That's correct, yes, ma'am.

1    Q    Were -- do you know whether his father was ever charged
2    with any aspect of this?
3    A    His father was arrested the day -- on state charges the
4    day we did the search warrant at 222 North Allis.  Izear Hall
5    was arrested separately -- I believe it was on separate
6    charges in a state case in or around November of 2017, and
7    Derrick Moten has not been arrested or charged.
8    Q    And what about Lakendra Thomas?
9    A    She was federally arrested in the same overall case, but
10   not related to the wiretap.
11   Q    Do you know the disposition of any of those cases outside
12   Mr. Peel?
13   A    Lakendra Thomas is still pending.  The State cases I
14   don't know.  Lakendra Thomas, just to clarify, was arrested in
15   2020.  So, what, three years later, on a separate delivery
16   from anything we've talked about today.
17   Q    Okay.  Now, other than what you picked up from wiretaps
18   regarding Mr. Williams directing the individuals you
19   identified, do you know what other role they may have played?
20   Could any of them been leaders?  Could any of them been
21   directing?
22   A    We didn't find evidence of that.  So, I mean, is it
23   possible?  Sure, but we didn't find evidence of it.
24   Q    But you didn't wiretap them, did you?
25   A    Correct, we did not.

1   Q    So you don't know fully what everybody's role was, only

2   what you gathered from the wiretaps and the interceptions

3   on~-- for Mr. Williams; is that correct?

4   A    Correct.  We don't typically go down the chain, we

5   usually try to go up, and we didn't go up from Mr. Williams on

6   this one.

7   Q    So you determined up based on Mr. Williams' wiretap, but

8   you don't know the extent, how extensive the involvement and

9   the roles were of the other people involved, do you?

10  A    We know their roles based on our intercepts with

11  Mr. Williams, but it's possible they were doing stuff, you

12  know, possible and likely they were doing stuff outside of

13  what we intercepted on Mr. Williams' phone.

14  Q    When I say role, I mean in relationship with

15  Mr. Williams.  You don't know whether or not they

16  independently not only worked on their own, but what influence

17  or what they may have directed even Mr. Williams to do, do

18  you?

19  A    We didn't find any instances of anybody else directing

20  Mr. Williams, because --

21  Q    But you wouldn't know that if you did not wiretap the

22  people who were involved with him, would you?  You wouldn't

23  have the complete story, would you?

24  A    Overall, correct, you're not going to get the complete

25  story, but I mean, I did several wiretaps, and we don't

1    usually do -- wiretap every subject in the drug trafficking

2    organization's phone.

3    Q    Well, I understand that, but without knowing more

4    extensively about the inner workings of their relationships,

5    you have assumed it was Williams who was the leader, because

6    you wiretapped his phone and you got him directing them, but

7    you don't have the reverse.

8    A    I'd say -- I mean, I would describe it as it was pretty

9    apparent early on that Mr. Williams is the leader of the drug

10   trafficking organization.  I don't -- I mean, I wouldn't say

11   assumed.  You know, the calls kind of speak for theirselves.

12   Q    As far as his end --

13   A    As far as his role.

14   Q    -- of the conversation.

15            THE COURT REPORTER:  I'm sorry.

16            MS. BYRD:  Sorry.

17   BY MS. BYRD:

18   Q    As far as his end of the conversation.

19   A    Well, it's both ends of the conversation during the

20   wiretap, because we get both Mr. Williams' part of the

21   conversation and who he's talking to.

22            MS. BYRD:  Okay.  I'm going to pass the witness.

23                     Redirect Examination

24   BY MR. GORDON:

25   Q    Two quick points.  You said that you've done many

1    wiretaps.

2    A    Yes.

3    Q    How many wiretaps were done in this case?

4    A    In this case related to Mr. Williams' organization, just

5    one.

6    Q    Okay.  And that was for 30 days?

7    A    Correct.

8    Q    And that's it?

9    A    Yes.

10   Q    Okay.  The other question or issue is based on your

11   training and experience, do people who traffic narcotics

12   frequently possess firearms?

13   A    Yes.

14   Q    For what purpose?

15   A    For protection.

16   Q    Protection of what?

17   A    For protection from getting robbed from other drug

18   dealers slash gang members, or we've had instances lately

19   where they've shot at law enforcement when we were trying to

20   serve a search warrant.

21            MR. GORDON:  Thank you.  No further questions.

22            MS. BYRD:  I have no further questions, Your Honor.

23            THE COURT:  A bit of housecleaning before I move

24   forward.  The date the report provides that I'm dealing with

25   is September the 25th of 2020, which is draft five.  Is that

1    what you have, Ms. Byrd?

2          MS. BYRD:  Of the PSR, that's correct.

3          THE COURT:  Yes, ma'am.  Okay.  I just wanted to

4    make sure we were all on the same version that we were working

5    off of.

6          So on page 8, where we have the offense level

7    calculation, the paragraphs that we are dealing with are

8    paragraphs 30, which is a two-level enhancement for the

9    firearm; paragraph 31, which is a two-level enhancement for

10    premises that was maintained for the purposes of distributing

11    drugs; and paragraph 33, which is the adjustment for role in

12    the offense, which is, as drafted, currently calculated at

13    zero.

14          So I am assuming, Ms. Byrd, that your objection to

15    paragraph 30 and 31, and the government's objecting to

16    paragraph 33.  I have looked at the application notes for

17    possession of a firearm, and they are not particularly helpful

18    as to what type of possession is maintained, but based on the

19    evidence that I hear today, I'm going to sustain the objection

20    to paragraph 30 and decline to apply the two-level enhancement

21    for the firearm being possessed.  So I'm sustaining

22    Mr. Williams' objection to paragraph 30.

23          I'm overruling the objection to paragraph 31, as I

24    think there's ample evidence to indicate that even though he

25    wasn't living there and perhaps didn't own the residence at

1  222 Allis, he was maintaining that premises for the purposes

2  of dealing drugs, and he was storing drugs in his other

3  residence, which was found in the safe, as well as instructing

4  Ms. Thomas to pick up the quarter pound of marijuana.  So I'm

5  going to overrule the defendant's objection to paragraph 31.

6            I'm going to sustain the objection to paragraph 33

7  and find that Mr. Williams did have a leadership role and

8  apply the two-point enhancement.

9            So with those rulings being made, do we have any

10  other objections or issues that the Court was left to decide

11  pursuant to the plea agreement or otherwise?

12            MS. BYRD:  Excuse me, Your Honor.

13            THE COURT:  Sure.

14            MR. GORDON:  Your Honor, may I be heard on the

15  firearm issue when Ms. Byrd is ready?

16            THE COURT:  You may.

17            MS. BYRD:  Okay, Your Honor.

18            THE COURT:  Go ahead, Mr. Gordon.

19            MR. GORDON:  Your Honor, on the gun issue,

20  Mr. Williams was never caught with a gun.  There was not one

21  in the house on Warner.  There were two found in the drug

22  house on Allis.  One was in Mr. Moten's room; that was the

23  stolen pistol.  I don't know if that was the one that was

24  referenced in an earlier call or not.  Quite frankly it

25  doesn't matter, because the other gun is found in Guwop's

 1   radio, Mr. Hall's room.  And what's clear from what the Court

 2   has heard is Mr. Hall worked for this defendant.  He admitted

 3   to it.  I worked, I sold drugs for Mr. Williams out of the

 4   house on Allis.  And in his room during the search warrant

 5   they find meth, crack, cocaine, weed, the gun, at least those

 6   things, at least those five things.

 7            I know the instruction for the possession of the gun

 8   for the enhancement at 2D1.1 --

 9            THE COURT:  You talking about the application note?

10   You said instruction, but I don't . . .

11            MR. GORDON:  I'm sorry.  So, yes.  It's not very

12   clear, but --

13            THE COURT:  No, it's not very helpful, because it

14   addresses -- let me find back where I'm looking for.  So

15   (b)(1) deals with the gun.

16            MR. GORDON:  Yes, sir.

17            THE COURT:  And it says:  If a dangerous weapon was

18   possessed, increase by two.

19            MR. GORDON:  Yes, sir.

20            THE COURT:  How that defines possession and

21   whatnot's very -- not very helpful.  So I went to the

22   application note, and at least on the '19 -- 2018 version that

23   I have for the application note of (1)(b) talks about what a

24   firearm or dangerous weapon is, and that's really not an issue

25   here.  Shotgun or pistol would apply.  And it says why you do

1    it, because it shows increased violence.  The enhancement

2    should be applied if a weapon was present unless it's clearly

3    improbable, but the presence -- I guess I understand the

4    notion for conspiracy for drugs but not conspiracy for

5    possession of a firearm, and I guess those are the two I'm

6    having a struggle with, and when I can't find anything that

7    says that the drug could be possessed pursuant to -- I mean,

8    the gun could be possessed pursuant to a conspiracy, then it

9    leads me to the decision I've made.

10            MR. GORDON:  And, Your Honor, that authority

11    actually does exist as relevant conduct.  In the guidelines

12    section 1B1.3(a)(1), if someone involved in the conspiracy

13    possesses the gun in furtherance of the conspiracy, he can be

14    held accountable for it, and that's exactly what happened

15    here.  Hall had the gun because he's dealing dope for this

16    defendant, and under relevant conduct Mr. Williams can be held

17    accountable for it.

18            And ultimately I realize in terms of calculating the

19    guidelines this is not material, because the career offender

20    provision is going to drive the numbers here, but as far as

21    when Mr. Williams gets to BOP, whether or not a firearm's

22    involved can have a big effect.

23            THE COURT:  Understood.

24            MR. GORDON:  And I think under the guidelines --

25            THE COURT:  Probably no more effect than the career

 1   offender on violent felonies would have, but I'm not sure what
 2   more the BOP is going to do with the firearm possession versus
 3   the battery and the terroristic acts and whatnot.  I
 4   understand, but what I'm trying to do is figure out how to
 5   calculate his guideline range for purposes of this ruling, not
 6   foresee what the BOP may do with the gun charge or the gun
 7   issue.
 8           MR. GORDON:  Correct, I agree.  But for us the gun
 9   issue is important.
10           THE COURT:  Understood.
11           MR. GORDON:  And I think under 1B1.3, relevant
12   conduct, that he should receive the plus two for possession of
13   a firearm.
14           THE COURT:  Understood, and I'm going to note your
15   comments and stick with my decision, so . . .
16           Mr. Williams, I'm going to prepare your guideline
17   range, and once I do that, it will allow me to announce my
18   sentencing options.  I'm then going to give Ms. Byrd an
19   opportunity to speak on your behalf, and then I will give you
20   an opportunity to speak.  You're not required to, but that's
21   completely up to you.  And then I'll hear from Mr. Gordon
22   again, and then I'll announce my sentence.
23           And so I'm moving back over onto page 7, which is
24   the guideline computation.  No, I'm on 8, paragraph 28, which
25   indicates we're using the 2016 guideline manual, despite the

1   fact I was rummaging through the 2016 (sic).  Does anybody

2   know whether or not the '16 manual's going to be any different

3   on the notes that I just looked through?

4           PROBATION OFFICER:  Nothing at all, Your Honor.

5           THE COURT:  Okay.  So count 1, conspiracy to

6   distribute actual methamphetamine, the guideline for a

7   violation of 21 U.S.C., Section 846, is found at 2D1.1, and

8   the base offense level is 30, because the amount of actual

9   methamphetamine was at least 50, but less than 150 grams.  We

10  increase two levels because a premises was maintained for the

11  purposes of distributing drugs, as well as for the adjustment

12  of the role of leadership, which gives me an adjusted offense

13  level of 34.  Since Mr. Williams was at least 18 years old at

14  the time of the instant offense and the instant offense of

15  conviction is a felony that is either a crime of violence or a

16  controlled substance, and he's had two at least predicate

17  offenses, the base offense level is 37.

18          Is the government offering two or three points for

19  acceptance?

20          MR. GORDON:  Three, Your Honor.

21          THE COURT:  Giving me a total offense level of 34.

22          Ms. Byrd, any objection to the calculation of that

23  number?

24          MS. BYRD:  No, Your Honor.

25          THE COURT:  Moving over to Mr. Williams' criminal

1    history on paragraph 61 on page 14, his criminal history

2    convictions result in a subtotal criminal history score of 15.

3    Since he committed the instant offense while under a criminal

4    justice sentence of parole and a suspended imposition of

5    sentence, two points were added.  Total criminal history score

6    is 17, which would give him a Category VI.  And he also --

7    that's established because of his career criminal category.

8              Any objection to the criminal history calculation?

9              MS. BYRD:  No, Your Honor.

10             THE COURT:  Okay.  So my sentencing options can be

11   found at paragraph 88, on page 21.  With regard to custody,

12   the maximum (sic) term of imprisonment under the statute for

13   count 1 is 10 years, with a maximum term of life.  Based upon

14   a total offense level of 34 and a criminal history category of

15   VI, the guideline imprisonment range is 162 (sic) to 327

16   months.

17             MR. GORDON:  262, Your Honor?

18             THE COURT:  That's what I read.  Is that right, 262

19   to 3' --

20             MR. GORDON:  327.

21             THE COURT:  So 34, 262 to 327.

22             MR. GORDON:  Okay.  Thank you.  I may have misheard

23   you.  I apologize.

24             THE COURT:  No, that means the court reporter might

25   have, too.  So thank you for bringing it up.

1           MS. BYRD:  I thought I heard 162, but I may be

2     wrong.

3           THE COURT:  Well, it's 262 to 327.  That's what I

4     have written down and corrected from the 35 number.

5           MS. BYRD:  Okay.

6           THE COURT:  Statute indicates that I must impose a

7     term of supervised release of at least five years.  The

8     guideline range for supervised release in count 1 is five

9     years to life.  Mr. Williams is ineligible for probation

10    because it is expressly precluded by statute, as well as the

11    guidelines.  The statutory maximum fine is $10 million.

12    Special assessment of $100 is mandatory.  The fine range for

13    this offense under the guidelines is 40,000 to 10 million.

14    Doesn't appear to be any restitution in the case.

15          Ms. Byrd, is there any objection to my

16    interpretation of my sentencing options under statutory or

17    guideline provisions?

18          MS. BYRD:  I've not determined that there are any,

19    Your Honor.

20          THE COURT:  All right.  Then I'll give you the

21    floor.

22          MS. BYRD:  Could I have a moment, Your Honor?

23          THE COURT:  You may.

24          MS. BYRD:  This is one of those difficult ones, Your

25    Honor, because we have such an egregious history here, and I

1    don't have a whole lot to offer.  I will just point out that

2    if you look at this presentencing report, Mr. Williams has

3    been in the criminal justice system one way or another since

4    he was 14 years old.

5             I noted that in the PSR, at one point that he was

6    sent for some kind of evaluation, or whatever, to deal with,

7    quote, angry issues.  I find that the history is replete with

8    a teenager or a very young person who pretty much wrote his

9    own script and didn't seem to have many, if any, parameters.

10   Unfortunately, nothing or no one early on seriously

11   interrupted the course of what was going on.  Too much of this

12   went on way too long.  I don't know why.  I'm not going to say

13   so called the system failed him, but nothing seemed to have

14   gotten to Mr. Williams at a young enough age to get his

15   attention and give him some appreciation of his conduct.

16            I'm particularly disturbed by that there's some

17   signs here that should have allowed a more serious level of

18   intervention other than just steady arrest, arrest, arrest.  I

19   believe that there are some emotional, if not mental health

20   issues going on here, and I think that they have been going on

21   for quite a while with this defendant, and I don't think that

22   they were ever seriously, if at all, addressed.  I'm not

23   offering those as excuses, it's just that I would like the

24   Court to consider that this is a man who's still relatively

25   young who was allowed to be out of control, and something or

1    somebody failed him.

2            I hope that he gets, if he's open to it, the help

3    that he needs while he's in prison.  But at the same time, I

4    would like to note, at least the Court to consider as a

5    mitigating factor that based on this history, it's almost like

6    he never really had a chance or an opportunity was ever

7    created.  And it's unfortunate that any opportunity to be

8    better is going to come from incarceration, which, you know, I

9    can't say, I hope it works and so forth.  But I would like for

10   the Court to consider that, in addition to which there are

11   nine children here.  And at the time of his arrest, it was

12   very apparent that in the house he lived in with Ms. Thomas,

13   these are very young children, and that he was a father to

14   these children, and that removing him from that role will

15   leave a hole in these children's lives.

16           The sooner he's back the better, but I recognize

17   that these are just very serious charges and that he, like no

18   one else, has a right to just operate as he chooses to

19   operate.  But once again, why wasn't this conduct interrupted

20   at some point or another in this man's life?  I can't say, and

21   it's unfortunate that the interruption is coming where he's

22   likely to receive severe punishment.

23           Thank you.

24           THE COURT:  Thank you, Ms. Byrd.

25           Mr. Williams, do you have anything you want to add?

1          THE DEFENDANT:  No, sir.

2          THE COURT:  Did you say yes or no?

3          THE DEFENDANT:  No, sir.

4          THE COURT:  Okay.  Thank you.

5          Mr. Gordon.

6          MR. GORDON:  Your Honor, from what I see,

7   Mr. Williams has been in the criminal justice system since the

8   age of 18 all the way until now.  He's now 38 or 39.  And

9   during that time, he's amassed 18 various adult convictions

10  for some crimes that were not so serious, but some very

11  serious crimes.  When you look at paragraph 46 of his PSR,

12  you'll see how he was initially placed on probation but then

13  got revoked, and then how since about 2003 he's been on and

14  off parole and revoked time and time again, until he was

15  finally discharged in May of 2018.

16          During those 15 years he continued to reoffend,

17  committing drug offenses, assaults.  In paragraph 53 he shot

18  at an occupied vehicle.  In that case, the victim reported

19  that Mr. Williams pointed the gun at her as she was getting

20  out of her car, and then as the driver drove away he fired a

21  bullet into the vehicle, which hit it.

22          In paragraph 54, he was convicted of domestic

23  battery for hitting Courtney Neal in the face with a closed

24  fist, and then when her mother and another woman came to her

25  aid, he also hit them before he pled the residence.

1              Paragraph 56, we have another battery case where he

2      slapped Courtney Neal in the face and choked her.  When she

3      called 911 he left before police responded.  And then later on

4      that same day she called police again, and this time when the

5      police arrived she was being carried out of the house on a

6      stretcher because the defendant came back and beat her for

7      calling 911 for the previous assault.

8              Paragraph 57 is another drug case, possession of

9      cocaine with intent to deliver.  In that case he had 41

10     individually wrapped rocks the cocaine on him.  When he was

11     arrested he also had 17 outstanding warrants during that

12     arrest.  Notably he was on parole for that case when

13     everything in this case happened.

14             Also important to note when you look at

15     paragraph 69, when there were 100 pounds of marijuana found in

16     an apartment that he was responsible for, he was out on bond

17     for that State case when everything in this case happened.

18             So in summary, while on bond and on parole, in this

19     case we made four buys of methamphetamine from Mr. Williams by

20     himself or through Mr. Peel.  That doesn't count the

21     two ounces of sham dope that he sold us on Allis Street.  He's

22     running a dope house on Allis, where at least one man is

23     running the show for him.  He's got his girlfriend paying off

24     his drug sources down in Texas and Mexico.  He's got weed in

25     his house.  He's dealing drugs out of his house, where he's

1    got his kids living with him.

2          So based on all that, I mean, his range is 262 to

3    327, and quite frankly, with his criminal history and what he

4    did in this case, I don't see any reason to depart from that

5    range.  And so simply we're going to ask the Court to sentence

6    him within the guideline range.

7          Thank you.

8          THE COURT:  After considering Mr. Williams'

9    presentence report in its entirety and all of the testimony

10   I've heard today, as well as the comments from counsel, and

11   considering the factors found in 18 U.S.C., Section 3553, it's

12   the judgment of the Court, Mr. Williams, that you're committed

13   to the custody of the Bureau of Prisons to be imprisoned for a

14   term of 275 months.

15         I'm going to recommend that you participate in

16   substance abuse treatment, mental health counseling with an

17   emphasis on domestic violence, and educational and vocational

18   programs during incarceration.

19         Upon release from imprisonment, you will be on

20   supervised release for a term of five years.  You must report

21   to the probation office in the district to which you are

22   released within 72 hours of your release from the custody of

23   the Bureau of Prisons and comply with all mandatory and

24   standard conditions that apply.

25         You must participate in a substance abuse treatment

1    program under the guidance and supervision of the probation

2    office.  The program may include drug and alcohol testing,

3    outpatient counseling and residential treatment.  You must

4    abstain from the use of alcohol during your treatment.  You

5    must pay for the cost of treatment at a rate of $10 per

6    session, with a total cost not to exceed $40 per month based

7    on your ability to pay.  If you can't afford the copayment it

8    can be waived.

9          You must participate in a domestic violence

10   counseling program under the guidance and supervision of the

11   probation office under the same copayment arrangement.

12         You must cooperate in the collection of DNA as

13   directed by the probation office.

14         I'm not going to impose a fine because you cannot

15   afford one, but the $100 special assessment is mandatory and

16   imposed.

17         This sentence is imposed, as you have a criminal

18   history, an extensive criminal history, which consists of

19   violent and drug offenses.  Your criminal history shows a

20   disregard for the law and authority figures.  Prior sentences

21   and conditions of probation, imprisonment, parole and

22   suspended imposition of sentences did nothing to dissuade your

23   criminal endeavors, which is evidenced by your propensity to

24   commit new offenses while under such terms, including the

25   instant offense.

 1              The sentence is to reflect the seriousness of your

 2   offense, promote respect for the law and address your needs.

 3   It is sufficient but no greater than necessary to address

 4   those issues.

 5              Mr. Williams, is there anything about my sentence

 6   that violates any agreement you had with anyone?

 7              THE DEFENDANT:  No.

 8              THE COURT:  Is there anything about it illegal,

 9   Ms. Byrd?

10              MS. BYRD:  Not that I can determine.

11              THE COURT:  Okay.  Anything from the government?

12              MR. GORDON:  No, Your Honor.

13              THE COURT:  Okay.  Mr. Williams, you can appeal your

14   conviction if you believe that your guilty plea was somehow

15   unlawful or involuntary, or if there was some other

16   fundamental defect in the proceeding that was not waived by

17   your guilty plea.  You also have a statutory right to appeal

18   your sentence under certain circumstances, particularly if you

19   think the sentence is contrary to law.  With few exceptions, a

20   notice of appeal must be filed within 14 days of judgment

21   being entered in your case.  If you're unable to pay the cost

22   of an appeal, you may apply for leave to appeal in forma

23   pauperis.  If you ask, the Clerk of the Court will prepare and

24   file a notice of appeal on your behalf.

25              Mr. Williams, do you understand your appeal rights?

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  Okay.  Ms. Byrd, can you think of

3    anything else before we go off the record?

4              MS. BYRD:  No, Your Honor.

5              THE COURT:  Mr. Gordon?

6              MR. GORDON:  No, Your Honor.

7              THE COURT:  All right.  Court will be in recess.

8    Thank y'all.

9         (Proceedings concluded at 3:01 p.m.)

10                         * * * * *

1                            *  *  *  *  *

2                            I N D E X

3    Testimony of Stephen Cupp

4              Direct by Mr. Gordon                    10

5              Cross by Ms. Byrd                       36

6              Redirect by Mr. Gordon                  51

7                            *  *  *  *  *

8                        E X H I B I T S

9    (None.)

10                           *  *  *  *  *

11                    CERTIFICATE OF REPORTER

12        I, Stephen W. Franklin, Registered Merit Reporter, and

13   Certified Realtime Reporter, certify that the foregoing is a

14   correct transcript, to the best of my ability, from the record

15   of proceedings in the above-entitled matter.

16        Dated this 26th day of JANUARY, 2021.

17

18        /s/Stephen W. Franklin
          _____
19        Stephen W. Franklin, RMR, CRR

20

21

22

23

24

25